1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

INVENERGY THERMAL LLC, and
GRAYS HARBOR ENERGY LLC,

                          Plaintiffs,

        v.

LAURA WATSON, in her official
capacity as Director of the Washington
State Department of Ecology,

                          Defendant.

CASE NO. 3:22-cv-05967-BHS

ORDER

This matter is before the Court on Defendant Washington State Department of

Ecology's[1] Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings,[2]

Dkt. 21. Plaintiff Invenergy Thermal LLC alleges that, through a subsidiary of a

---

[1] The named defendant is Laura Watson, who is sued in her official capacity as the
director of the Department of Ecology. For clarity, the Court refers to the defendant as the
Department of Ecology.

[2] Ecology captioned this motion as a "FRCP 12(c) Motion to Dismiss." Dkt. 21 at 1.
Because this motion is made pursuant to Fed. R. Civ. P. 12(c) and Ecology filed an answer, Dkt.
20, the Court refers to it as a motion for judgment on the pleadings.

        Also, each party requests oral argument on this motion. Dkt. 21 at 1, Dkt. 27 at 1. These
requests are **DENIED**.

1    subsidiary, it "wholly owns" Plaintiff Grays Harbor Energy LLC, which, in turn, "wholly

2    owns" the Grays Harbor Energy Center—an electricity-generating natural gas power

3    plant located in Washington State. Dkt. 1, ¶¶ 3, 4.

4        Plaintiffs challenge a provision of Washington's Climate Commitment Act (CCA),

5    chapter 70A.65 RCW, which directs Ecology to allocate to electric utilities—at no cost—

6    allowances to emit a certain amount of greenhouse gases per year. Owners of electricity

7    generating facilities like the Grays Harbor Energy Center, by contrast, must purchase

8    such allowances at auction. Plaintiffs claim that the CCA's allocation of "no-cost

9    allowances"[3] to electric utilities, but not to owners of electricity generating facilities like

10   the Grays Harbor Energy Center, violates the dormant Commerce Clause and the

11   Fourteenth Amendment's Equal Protection Clause.

12       Plaintiffs argue that this statutory scheme discriminates against them in violation

13   of the dormant Commerce Clause because Invenergy is an out-of-state entity and,

14   according to Plaintiffs, the electric utilities that receive no-cost allowances are all owned

15   by in-state entities. Plaintiffs assert that the Grays Harbor Energy Center competes

16   against these utilities insofar as the utilities operate their own electricity generating

17   facilities. Plaintiffs similarly claim that the CCA violates the Equal Protection Clause by

18   treating electricity generating facilities differently than electric utilities without a rational

19   basis to do so.

20

21

22   _____

    [3] The parties refer to allowances allocated at no cost as "no-cost allowances." *See* Dkt. 1, ¶ 6; Dkt. 21 at 2–3; Dkt. 27 at 6. So does the Court.

1      Ecology responds that, far from being discriminatory, the CCA allocates no-cost

2   allowances to in-state entities and out-of-state entities alike. It also contends that

3   electricity generating facilities like the Grays Harbor Energy Center are not substantially

4   similar to electric utilities. This is so, Ecology asserts, because electric utilities sell

5   electricity to the public on the retail market whereas electricity generating facilities sell

6   electricity to larger entities, including electric utilities, on the wholesale market. Ecology

7   finally argues that the challenged statute serves a legitimate governmental interest: to

8   mitigate the cost of electricity sold to public consumers while electric utilities make

9   efforts to reduce their greenhouse gas emissions.

10      The Court concludes that Invenergy lacks constitutional standing to advance its

11   claims under both the dormant Commerce Clause and the Equal Protection Clause. This

12   is because Invenergy does not own the Grays Harbor Energy Center; a subsidiary three

13   degrees separated from itself does. Grays Harbor Energy LLC also lacks standing to

14   advance its asserted dormant Commerce Clause claims. Unlike Invenergy, Grays Harbor

15   Energy LLC is an in-state entity without any out-of-state economic interests of its own.

16   Under these circumstances, it cannot allege a plausible injury in fact under the dormant

17   Commerce Clause, which, at its core, serves to prevent discrimination against out-of-state

18   economic interests.

19      Even if Invenergy or Grays Harbor Energy LLC had standing to advance their

20   dormant Commerce Clause claims, these claims would still fail. Under the CCA, there is

21   one out-of-state owner of an electric utility in Washington that is entitled to no-cost

22   allowances, and two other in-state owners of electricity generating facilities that are not

so entitled. Thus, the CCA does not discriminate based on an entity's local contacts. At most, it discriminates based on an entity's status as either an electric utility or an electricity generating facility. Because these entities primarily serve different markets, they are not similarly situated and the CCA's differing treatment of them does not offend the dormant Commerce Clause.

Simply put, the CCA treats all owners of electric utilities the same, regardless of whether those owners are in-state entities or out-of-state entities. It also treats all owners of electricity generating facilities the same, again regardless of an owner's location. This plainly does not discriminate against out-of-state economic interests.

For this same reason, the CCA also does not violate the Equal Protection Clause, which generally requires similarly situated persons to be treated alike. In any event, as Ecology asserts, the allocation of no-cost allowances to electric utilities, but not to electricity generating facilities like the Grays Harbor Energy Center, is rationally related to a legitimate governmental purpose.

## I.    BACKGROUND

Invenergy Thermal LLC "is an independent power producer that owns and operates power plants across the United States." Dkt. 1, ¶ 1. It is incorporated in Delaware and headquartered in Chicago, Illinois. *Id.*

Invenergy, "*through other subsidiaries*, wholly owns Grays Harbor Energy LLC, which wholly owns the Grays Harbor Energy Center, a power plant located in Washington." Dkt. 1, ¶ 3 (emphasis added). Specifically, "Grays Harbor Energy LLC is a wholly owned subsidiary of Invenergy Grays Harbor LLC," which, in turn, "is a wholly

1   owned subsidiary of Invenergy Grays Harbor Holdings LLC," which, again in turn, "is a

2   wholly owned subsidiary of Invenergy." *Id.* ¶ 20 n.2.

3        The record does not indicate where these two "intermediate subsidiaries" are

4   incorporated, headquartered, or otherwise conduct their businesses. However, Grays

5   Harbor Energy LLC is incorporated in Delaware and headquartered in Elma,

6   Washington. Dkt. 1, ¶ 20.

7        In 2021, the Washington Legislature enacted the CCA to address certain impacts

8   of climate change on the State. *See* RCW 70A.65.005. To aid "covered entities"[4]  in

9   reducing their greenhouse gas emissions, the CCA requires Ecology to implement a cap

10  and invest program concerning such emissions. RCW 70A.65.060(1); *see* RCW

11  70A.65.010(58) (defining "[p]rogram" as "the greenhouse gas emissions cap and invest

12  program"). The parties agree that the Grays Harbor Energy Center is a "covered entity"

13  and thus subject to the cap and invest program. Dkt. 1, ¶ 22; Dkt. 21 at 4.

14       Under this program, Ecology must (1) implement a cap on greenhouse gas

15  emissions from covered entities, RCW 70A.65.060(1), and (2) distribute "allowances"—

16  meaning, "an authorization to emit up to one metric ton of carbon dioxide equivalent,"

17  RCW 70A.65.010(1)—through auctions open to "covered entities, opt-in entities, and

18  general market participants that are registered entities in good standing." RCW

19  70A.65.100(4). The CCA requires Ecology to "adopt by rule an auction floor price" for

20  

---

21  [4] Under the CCA, "'[c]overed entity' means a person that is designated by the department as subject to RCW 70A.65.060 through 70A.65.210." RCW 70A.65.010(23).  Ecology's regulations define covered entities generally as those whose covered emissions exceed 25,000

22  metric tons of "carbon dioxide equivalent" per year. *See* WAC 173-446-030; WAC 173-446-060.

1    these allowances and prohibits Ecology from "sell[ing] allowances at bids lower than the

2    auction floor price." RCW 70A.65.150(1). Ecology must also "adopt by rule . . . a

3    schedule for the floor price to increase by a predetermined amount every year." *Id.*

4         However, the following categories of entities must receive an allocation of

5    allowances at no cost: (1) "emissions-intensive and trade-exposed" facilities;[5] (2)

6    "consumer-owned and investor-owned electric utilities"; and (3) "covered entities that are

7    natural gas utilities." RCW 70A.65.110–.130. Although the Grays Harbor Energy Center

8    generates electricity and participates in an electricity market, Plaintiffs acknowledge that

9    it is not an electric utility.[6] *See* Dkt. 1, ¶ 7. Accordingly, the Grays Harbor Energy Center

10   does not qualify for no-cost allowances under the CCA. *See* Dkt. 1, ¶ 7; Dkt. 21 at 5; Dkt.

11   27 at 6.

12        Concerning electric utilities, the purpose of these no-cost allowances is "to

13   mitigate the cost burden of the [cap and invest] program on electricity customers." RCW

14   70A.65.120(1). The availability of no-cost allowances to electric utilities reduces over

15   time and "[u]nder no circumstances may utilities receive any free allowances after 2045."

16   RCW 70A.65.120(2)(d).

17        In these respects, the CCA works in tandem with another Washington statute, the

18   Clean Energy Transformation Act (CETA), chapter 19.405 RCW. CETA requires all

19   _____

20        [5] Emissions-intensive and trade-exposed facilities include entities that engage in petroleum refining or numerous forms of manufacturing. RCW 70A.65.110(1)(a)–(m). They do not include entities that generate, sell, or distribute electricity. *See id.*

21        [6] Electric utilities sell and distribute electricity to the public on the retail market. Dkt. 1, ¶
22   7. Electricity generating facilities do not. *See id.* They instead sell electricity on the wholesale market, which includes selling electricity to electric utilities. *See id.*

1   electric utilities in Washington to become "one hundred percent carbon-neutral by 2030,

2   and one hundred percent carbon-free by 2045." RCW 19.405.010(2). Consistent with the

3   CCA's goal of mitigating the cost burden of its cap and invest program on electricity

4   customers, *see* RCW 70A.65.120(1), CETA provides that "the state must," among other

5   things, "provide safeguards to ensure that the achievement of this policy does not . . .

6   impose unreasonable costs on utility customers." *Id.* Because the Grays Harbor Energy

7   Center is not an electric utility, it is not subject CETA's requirements. *See generally*

8   chapter 19.405 RCW; *see also* Dkt. 21 at 5; Dkt. 27 at 21.

9        Plaintiffs allege that Ecology's allocation of no-cost allowances under the CCA to

10  electric utilities, but not to electricity generating facilities like the Grays Harbor Energy

11  Center: (1) violates the dormant Commerce Clause "by discriminating in effect against

12  out-of-state economic interests to the benefit of in-state economic interests," Dkt. 1, ¶

13  157, (2) violates the dormant Commerce Clause by "excessively burden[ing] interstate

14  commerce without advancing any legitimate local interest," *id.* ¶ 174, and (3) violates the

15  Equal Protection Clause of the Fourteenth Amendment by "treat[ing] independent power

16  plant owners differently from other similarly situated plant owners, namely local

17  utilities," in a manner that "is not rationally related to any legitimate governmental

18  purpose." *Id.* ¶ 187.

19       Plaintiffs seek a judicial determination that the CCA's requirement that Ecology

20  allocate no-cost allowances to electric utilities, but not to electricity generating facilities

21  like the Grays Harbor Energy Center, is unconstitutional "as applied." Dkt. 1, ¶ 194.

22  Plaintiffs also seek an order "[r]equir[ing] Defendant . . . to provide no-cost allowances to

1    Plaintiffs, or requir[ing] Defendant . . . to re-allocate no-cost allowances or requir[ing]

2    electric utilities to transfer no-cost allowances to Plaintiffs; or otherwise enjoin[ing]

3    Defendant . . . from enforcing the CCA to disadvantage Plaintiffs." *Id.* ¶ 195.

4         Ecology filed an answer, Dkt. 20, and subsequently moved for judgment on the

5    pleadings under Fed. R. Civ. P. 12(c), Dkt. 21. Plaintiffs oppose this motion. Dkt. 27. The

6    parties' arguments are addressed below.

7    ## II.   DISCUSSION

8    **A.    Federal Rule of Civil Procedure 12(c) Standard**

9         Federal Rule of Civil Procedure 12(c) "is 'functionally identical' to Rule 12(b)(6)

10   and . . . 'the same standard of review' applies to motions brought under either rule."

11   *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir.

12   2011) (quoting *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)).

13   Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal

14   theory or the absence of sufficient facts alleged under a cognizable legal theory.

15   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A plaintiff's

16   complaint must allege facts to state a claim for relief that is plausible on its face. *Ashcroft*

17   *v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party

18   seeking relief "pleads factual content that allows the court to draw the reasonable

19   inference that the defendant is liable for the misconduct alleged." *Id*.

20        Although courts must accept as true the complaint's well-pleaded facts,

21   conclusory allegations of law and unwarranted inferences will not defeat an otherwise

22   proper Rule 12(b)(6) motion to dismiss. *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246,

1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do. Factual allegations must be enough to raise a right to relief

above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations omitted). This requires a plaintiff to plead "more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*,

550 U.S. at 555).

When granting a Rule 12(b)(6) motion to dismiss, "a district court should grant

leave to amend even if no request to amend the pleading was made, unless it determines

that the pleading could not possibly be cured by the allegation of other facts." *Cook,

Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). Courts

may also deny leave to amend when the facts are not in dispute and the sole issue is

whether there is liability as a matter of substantive law. *Albrecht v. Lund*, 845 F.2d 193,

195–96 (9th Cir. 1988).

**B.** **The proper test for determining whether a state law violates the dormant Commerce Clause.**

The Court begins by clarifying the proper test to be applied when determining

whether a particular state law violates the dormant Commerce Clause.

The Commerce Clause grants Congress the "Power . . . To regulate Commerce . . .

among the several States." U.S. CONST. art. I, § 8, cl. 3. "[T]he Commerce Clause not

only vests Congress with the power to regulate interstate trade; the Clause also

1  'contain[s] a further, negative command,' one effectively forbidding the enforcement of

2  'certain state [economic regulations] even when Congress has failed to legislate on the

3  subject.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting

4  *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). "This

5  'negative' aspect of the Commerce Clause" is "generally known as 'the dormant

6  Commerce Clause.'" *Tenn. Wine & Spirits Retailers Association v. Thomas*, 588 U.S.

7  ___, ___, 139 S. Ct. 2449, 2459 (2019) (some internal quotation marks omitted) (quoting

8  *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).

9        Plaintiffs and Ecology assert that courts apply a two-tiered test for determining

10  whether a particular state law violates the dormant Commerce Clause. Dkt. 21 at 7–8;

11  Dkt. 27 at 14. Under the first tier, they claim, courts consider whether a state law

12  discriminates against out-of-state entities on its face, in its purpose, or in its practical

13  effect. Dkt. 21 at 8 (citing *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 97 F. Supp. 3d

14  1256, 1267 (W.D. Wash. 2015)); Dkt. 27 at 14 (citing *Rocky Mountain Farmers Union v.

15  Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013)). If the state law is discriminatory, "'it is

16  unconstitutional unless it serves a legitimate local purpose, and this purpose could not be

17  served as well by available nondiscriminatory means.'" Dkt. 27 at 14 (quoting *Rocky

18  Mountain Farmers Union*, 730 F.3d at 1087).

19        Under the second tier, the parties assert, a state law may violate the dormant

20  Commerce Clause even if it does not discriminate against out-of-state entities. Dkt. 21 at

21  8; Dkt. 27 at 14. They claim that a state law may do so under the Supreme Court's

22  decision in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Dkt. 21 at 8; Dkt. 27 at 14.

1   Indeed, the Ninth Circuit Court of Appeals has interpreted *Pike* as holding that a state law

2   violates the dormant Commerce Clause when it "places a 'significant' burden on

3   interstate commerce" such that the law's "effect on interstate commerce clearly

4   outweighs [its] local benefits." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452

5   (9th Cir. 2019).

6         However, after the parties submitted their briefing on Ecology's Rule 12(c)

7   motion, the Supreme Court issued its decision in *National Pork Producers*, which

8   criticized the second tier of this test. In that decision, the Court rejected an argument that,

9   "[u]nder *Pike*, . . . a court must at least assess the burden imposed on interstate commerce

10  by a state law and prevent its enforcement if the law's burdens are clearly excessive in

11  relation to the putative local benefits." *Nat'l Pork Producers*, 598 U.S. at 377 (internal

12  quotation marks omitted). The Court reasoned that this argument "overstate[s] the extent

13  to which *Pike* and its progeny depart from the antidiscrimination rule that lies at the core

14  of [its] dormant Commerce Clause jurisprudence." *Id.*

15        The Court clarified that the dormant Commerce Clause essentially "prohibits the

16  enforcement of state laws driven by . . . economic protectionism—that is, regulatory

17  measures designed to benefit in-state economic interests by burdening out-of-state

18  competitors." *Nat'l Pork Producers*, 598 U.S. at 369 (internal quotation marks omitted)

19  (quoting *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)). The

20  Court emphasized that "this antidiscrimination principle lies at the 'very core' of [its]

21  dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 369

22

1  (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581

2  (1997)).

3      The Court explained that, "if some of [its] cases focus on whether a state law

4  discriminates on its face, the *Pike* line serves as an important reminder that a law's

5  practical effects may also disclose the presence of a discriminatory purpose." *Nat'l Pork*

6  *Producers*, 598 U.S. at 377. Put differently, "*Pike* serves to "'smoke out' a hidden'

7  protectionism." *Id.* at 379 (quoting parenthetically R. Fallon, The Dynamic Constitution

8  311 (2d ed. 2013)). Thus, the dormant Commerce Clause is generally "concern[ed] with

9  preventing purposeful discrimination against out-of-state economic interests." *Nat'l Pork*

10  *Producers*, 598 U.S. at 371.

11      Nevertheless, the Supreme Court acknowledged it "has left the 'courtroom door

12  open' to challenges premised on 'even nondiscriminatory burdens,'" and that "'a small

13  number of [its] cases have invalidated state laws . . . that appear to have been genuinely

14  nondiscriminatory.'" *Nat'l Pork Producers*, 598 U.S. at 371 (quoting *Davis*, 553 U.S. at

15  353; *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997)). "Often, such cases

16  have addressed state laws that impose burdens on the arteries of commerce, on trucks,

17  trains, and the like." *Nat'l Pork Producers*, 598 U.S. at 392 (Sotomayor, J., concurring)

18  (internal quotation marks omitted). And at least one case invalidated a nondiscriminatory

19  state law that regulated tender offers to shareholders. *Id.* (Sotomayor, J., concurring)

20  (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 643–46 (1982)).

21      Therefore, with few exceptions, a state law violates the dormant Commerce

22  Clause only if it "discriminates against out-of-state entities on its face, in its purpose, or

1   in its practical effect, . . . unless it 'serves a legitimate local purpose, and this purpose

2   could not be served as well by available nondiscriminatory means.'" *Rocky Mountain*

3   *Farmers Union*, 730 F.3d at 1087 (quoting *Maine v. Taylor*, 447 U.S. 131, 138 (1986));

4   *accord Nat'l Pork Producers*, 598 U.S. at 377–81.

5   **C.   Plaintiffs lack constitutional standing to advance their asserted dormant**
     **Commerce Clause claims.**

6          Having clarified the applicable test, the Court considers whether Plaintiffs have

7   constitutional standing to advance their asserted dormant Commerce Clause claims. *See*

8   *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1265 (9th Cir. 1999) ("[F]ederal courts

9   are required sua sponte to examine jurisdictional issues such as standing.").

10         "In order to have standing to sue in federal court, Article III of the Constitution of

11  the United States requires that a complainant have," among other things, "suffered an

12  injury in fact, which the Supreme Court has defined as the invasion of a concrete,

13  imminent, and legally cognizable interest."[7] *Sargeant v. Dixon*, 130 F.3d 1067, 1069

14  (D.C. Cir. 1997); *accord Clark v. City of Lakewood*, 259 F.3d 996, 1011 n.7 (9th Cir.

15  2001). This requires the plaintiff to "allege a distinct and palpable injury to *himself.*"

16  *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (emphasis added).

17         In determining whether Invenergy or Grays Harbor Energy LLC has constitutional

18  standing to advance the asserted dormant Commerce Clause claims, the Court first

19  clarifies which of these entities owns the electricity generating facility at issue: the Grays

20

21         [7] A plaintiff must also establish that the injury is fairly traceable to the challenged action
     of the defendant, and that it is likely, not merely speculative, that the alleged injury will be
22   redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).

1  Harbor Energy Center. Plaintiffs wrongly assert that Invenergy owns it. The core of

2  Plaintiffs' dormant Commerce Clause claims is that, "[u]nder the [CCA], local electric

3  utilities receive free, no-cost allowances, which enables them to run their plants without

4  regard to the greenhouse-gas emissions they produce" whereas "Invenergy Thermal LLC

5  ("Invenergy")[1], an out-of-state owner, on the other hand, must pay for its carbon." Dkt.

6  27 at 6. The footnote in this sentence states that, because "Invenergy wholly owns Grays

7  Harbor Energy LLC, . . . both Plaintiffs are collectively referred to as 'Invenergy' for

8  purposes of this brief." *Id.* at 6 n.1.

9      This is misleading. Grays Harbor Energy LLC—not Invenergy Thermal LLC—

10  "wholly owns the Grays Harbor Energy Center." Dkt. 1, ¶ 3. It is immaterial that a

11  subsidiary (Invenergy Grays Harbor LLC) of a subsidiary (Invenergy Grays Harbor

12  Holdings LLC) of Invenergy owns Grays Harbor Energy LLC. "A basic tenet of

13  American corporate law is that the corporation and its shareholders are distinct entities."

14  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Accordingly, "[a] corporate

15  parent which owns the shares of a subsidiary does not, for that reason alone, own or have

16  legal title to the assets of the subsidiary; and, it follows with even greater force, the parent

17  does not own or have legal title to the subsidiaries of the subsidiary." *Id.* at 475. It

18  therefore follows with yet even greater force that a corporate parent (here, Invenergy)

19  does not own or have legal title to the *assets* of a subsidiary that is *three degrees*

20  separated from itself (here, Grays Harbor Energy LLC). The Court rejects Plaintiffs'

21  implicit contention otherwise.

22

1   Because Invenergy does not own the Grays Harbor Energy Center, *see Dole Food*,

2   538 U.S. at 474–75, it fails to allege an injury to itself by the CCA's allocation of no-cost

3   allowances to electric utilities, but not to electricity generating facilities like the Grays

4   Harbor Energy Center. *See Warth*, 422 U.S. at 501. The Ninth Circuit has similarly held

5   that a subsidiary that "does not contend that the rights [at issue] belong to it, but to its

6   parent company," "fails to establish standing." *Aschley Creek Properties, L.L.C. v.*

7   *Larson*, 403 Fed. App'x 273, 274 (9th Cir. 2010) (citing *Dole Food*, 538 U.S. at 474–

8   475)).[8] Under *Dole Food*, the inverse must also be true: a corporate parent that does not

9   own the asset at issue because it is wholly owned by a subsidiary also fails to establish

10   standing. *See* 538 U.S. at 475. Therefore, Invenergy does not have constitutional standing

11   to advance the asserted dormant Commerce Clause claims.

12   Nor does Grays Harbor Energy LLC. The complaint concedes that Grays Harbor

13   Energy LLC is an *in-state* entity, not an out-of-state entity. It is headquartered in Grays

14   Harbor County, Washington, Dkt. 1, ¶ 20, and appears to exist primarily, if not solely, to

15   operate the Grays Harbor Energy Center, which is also located in Grays Harbor County.

16   *Id.* ¶ 26. Moreover, "[t]he vast majority of the electricity that Grays Harbor generates is

17   sold to entities within Washington." *Id.* ¶ 38. There is no indication that Grays Harbor

18   Energy LLC does anything but "own and operate the Grays Harbor Energy Center." *Id.*

19

20

21   _____

   [8] Although they are not binding precedent, unpublished dispositions of the Ninth Circuit issued on or after January 1, 2007, may be cited in accordance with Federal Rule of Appellate

22   Procedure 32.1. Ninth Cir. R. 36-3(a)–(b).

1    Given these concessions, Grays Harbor Energy LLC does not plead a plausible

2 "invasion" of a "legally cognizable interest" under the dormant Commerce Clause.

3 *Sargeant*, 130 F.3d at 1069. Its alleged injury under both of its dormant Commerce

4 Clause claims is that "the CCA's distribution of no-cost allowances deprives [it] of the

5 rights, privileges, and immunities under the Commerce Clause." Dkt. 1, ¶¶ 171, 182. But

6 the dormant Commerce Clause generally prohibits state "regulatory measures designed to

7 benefit *in-state* economic interests by burdening *out-of-state* competitors." *Nat'l Pork*

8 *Producers*, 598 U.S. at 369 (internal quotation marks omitted and emphasis added)

9 (quoting *Davis*, 553 U.S. at 337–38).

10    The Court is mindful that a "cognizable injury from unconstitutional

11 discrimination against interstate commerce does not stop at members of the class against

12 whom a State discriminates." *Tracy*, 519 U.S. at 286. Beyond this, for example,

13 "customers of that class may also be injured," such as when a "customer is liable for

14 payment of [a] tax and as a result presumably pays more for the gas it gets from out-of-

15 state producers and marketers." *Id.*

16    No such scenario exists here. Grays Harbor Energy LLC does not identify *any* out-

17 of-state economic interest of its own against which the CCA *could* discriminate. It also

18 does not even claim to be burdened as the customer of any discriminated-against out-of-

19 state entity, or to be burdened in any similar way. *See Tracy*, 519 U.S. at 286.

20 Accordingly, Grays Harbor Energy LLC also fails to allege a plausible injury in fact

21 under the dormant Commerce Clause.

22

1    For these reasons, both Invenergy and Grays Harbor Energy LLC lack

2 constitutional standing to advance their asserted dormant Commerce Clause claims.

3 Because their deficiencies cannot be cured through the allegation of other facts, these

4 claims are **DISMISSED with prejudice**. *See Schmier v. U.S. Court of Appeals for the*

5 *Ninth Circuit*, 279 F.3d 817, 824 (9th Cir. 2002) (dismissal with prejudice on standing

6 was appropriate when appellant "could not have possibly amended his complaint to

7 allege an [Article III] injury in fact"); *accord Fieldturf, Inc. v. Sw. Recreational Indus.,*

8 *Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004) ("Ordinarily, dismissal for lack of standing is

9 without prejudice. On occasion, however, a dismissal with prejudice is appropriate,

10 especially where 'it [is] plainly unlikely that the plaintiff [will be] able to cure the

11 standing problem.'" (internal citation omitted) (quoting *H.R. Tech. v. Astechnologies,*

12 *Inc.*, 275 F.3d 1378, 1385 (Fed. Cir. 2002)).

13 **D.    Even if Plaintiffs had standing to advance their asserted dormant Commerce**
**Clause claims, these claims would fail on the merits.**

14

15    Even if either Invenergy or Grays Harbor Energy LLC had standing to advance the

asserted dormant Commerce Clause claims, these claims would still fail for numerous

16 reasons.

17

18 **1.    Plaintiffs' claim that the CCA imposes an excessive burden on**
**interstate commerce in relation to the putative local benefits is meritless.**

19    Plaintiffs claim that the CCA's allocation of no-cost allowances to electric

20 utilities, but not to electricity generating facilities, violates the dormant Commerce

21 Clause by "excessively burden[ing] interstate commerce without advancing any

22 legitimate local interest." Dkt. 1, ¶ 174. As explained, however, the Supreme Court

1   recently rejected a similar argument, explaining that it "overstate[s] the extent to which

2   *Pike* and its progeny depart from the antidiscrimination rule that lies at the core of [its]

3   dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 377. This

4   claim accordingly lacks merit.[9]

5        **2.    Plaintiffs' claim that the CCA discriminates against out-of-state economic interests is not plausible.**

6        Plaintiffs also claim that the CCA's allocation of no-cost allowances to electric

7   utilities violates the dormant Commerce Clause "by discriminating in effect against out-

8   of-state economic interests to the benefit of in-state economic interests." Dkt. 1, ¶ 157. To

9   reiterate, a state statute violates the dormant Commerce Clause if it "discriminates against

10   out-of-state entities on its face, in its purpose, or in its practical effect, . . . unless it

11   'serves a legitimate local purpose, and this purpose could not be served as well by

12   available nondiscriminatory means.'" *Rocky Mountain Farmers Union*, 730 F.3d at 1087

13   (quoting *Taylor*, 447 U.S. at 138); *accord Nat'l Pork Producers*, 598 U.S. at 377–81. The

14   CCA does not discriminate in any of these respects.

15        **a.    The CCA does not discriminate against out-of-state entities on its face.**

16        The CCA does not discriminate against out-of-state entities on its face because

17   electric utilities and electricity generating facilities are not substantially similar entities.

18   "Conceptually, of course, any notion of discrimination assumes a comparison of

19   substantially similar entities." *Tracy*, 519 U.S. at 298. When "different entities serve

20

---

21       [9] Plaintiffs do not claim that the CCA burdens the "arteries" of interstate commerce. *Nat'l Pork Producers*, *598 U.S.* at 392 (Sotomayor, J., concurring). The Court, therefore, does not

22   consider any such claim.

different markets," they "would continue to do so even if the supposedly discriminatory burden were removed." *Id.* at 299. "If in fact that should be the case, eliminating the . . . regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

Plaintiffs concede that "[e]lectric utilities and electricity generating facilities occupy distinct positions in electricity markets." Dkt. 1, ¶ 7. Whereas "[a]n electric utility distributes and delivers electricity to the public" on the retail market, electricity generating facilities like the Grays Harbor Energy Center do not. *Id.* They instead sell electricity on the wholesale market, which includes selling electricity *to* electric utilities. *See id.* ("Independent power producers . . . regularly sell the electricity generated by their facilities to electric utilities as well as some end-users."). Electric utilities are also subject to various statutory and regulatory requirements that electricity generating facilities are not, such as CETA. *See generally* chapter 19.405 RCW.

Plaintiffs contend that, because "many utilities own and operate power plants and other types of electricity generating facilities," Dkt. 1, ¶ 7, electric utilities and non-utility-operated electricity generating facilities "compete against each other as power-plant owners." Dkt. 27 at 10. In this sense, Plaintiffs argue, the CCA unlawfully discriminates against electricity generating facilities because electric utilities "will use [their no-cost allowances] to cover their plants' compliance obligations." *Id.* at 18.

It is true that electric utilities may request Ecology to transfer their no-cost allowances to electricity generating facilities that they operate. WAC 173-446-420(2)(a).

1    However, the CCA's allocation of no-cost allowances to electric utilities must be tailored

2    to the amount of electricity that a utility supplies to the public on the retail market—a

3    captive market in which electricity generating facilities do not participate. *See* RCW

4    70A.65.120(2)(b), (c), (d) (stating that the allocation of no-cost allowances to electric

5    utilities "must be consistent with a forecast . . . of each utility's *supply and demand*, and

6    the cost burden resulting from the inclusion of" covered entities for each compliance

7    period (emphasis added)); WAC 173-446-230(2)(a) ("Ecology will use utility-specific

8    demand forecasts that provide estimates of *retail* electric load." (Emphasis added)).[10]

9         As Ecology persuasively asserts: "Because the supply of no-cost allowances is

10   finite and directly tied to the power a utility supplies to its retail customers, any power

11   created by a utility's generating facilities that does not serve this load—i.e., bulk power

12   sold on the wholesale market—does not increase a utility's allocation of no-cost

13   allowances." Dkt. 30 at 5. As a result, the allocation of no-cost allowances applies

14   primarily to grant electric utilities a benefit in the captive market.

15        To modify this scheme "could subject [utilities] to economic pressure that in turn

16   could threaten the preservation of an adequate customer base to support the continued

17   provision of bundled services to the captive market." *Tracy*, 519 U.S. at 309. This is

18   significant, particularly because "the States' interest in protecting the captive market from

19   the effects of competition for the largest consumers is underscored by the common sense

20

21        [10] The complaint acknowledges this, stating that, under the CCA, electric utilities "will
     receive enough no-cost allowances to cover the emissions *associated with the electricity they sell*
22   *to consumers in Washington.*" Dkt. 1, ¶ 9 (emphasis added).

1    of our traditional recognition of the need to accommodate state health and safety

2    regulation in applying dormant Commerce Clause principles." *Id.* at 306. By comparison,

3    "[s]tate regulation of natural gas sales to consumers," for instance, "serves important

4    interests in health and safety in fairly obvious ways, in that requirements of dependable

5    supply and extended credit assure that individual buyers of gas for domestic purposes are

6    not frozen out of their houses in the cold months." *Id.* The same is true of state regulation

7    of electricity sales.

8        The Court accordingly "give[s] the greater weight to the captive market and the

9    . . . utilities' singular role in serving it," and, thus, treats electric utilities and electricity

10   generating facilities "as dissimilar for present purposes." *Tracy*, 519 U.S. at 304; *accord*

11   *NextEra Energy*, 48 F.4th at 320 ("*Tracy* prevented classifying a law as textually

12   discriminatory . . . because it applied primarily to grant utilities a tax preference in a

13   market where they were monopolies."). Put differently, because the CCA does "not

14   discriminate on the basis of a company's business contacts with the state, but rather on

15   the basis of its status" as either an electric utility or electricity generating facility, "the

16   statute d[oes] not offend the dormant Commerce Clause." *Allstate Ins. Co. v. Abbott*, 495

17   F.3d 151, 162 (5th Cir. 2007), *cert. denied*, 552 U.S. 1184 (2008); *accord Exxon Corp. v.*

18   *Governor of Maryland*, 437 U.S. 117, 127 (1978) (the dormant Commerce Clause does

19   not "protect[] the particular structure or methods of operation in a retail market").

20       Therefore, the challenged statute does not discriminate against out-of-state

21   economic interests on its face.

22

1   **b.     The CCA does not discriminate against out-of-state entities in its**
**purpose.**

2
3       The allocation of no-cost allowances to electric utilities, but not to electricity

generating facilities, does not discriminate against out-of-state entities in its purpose. The

4   challenged statute states that "[t]he legislature intends by this section to allow all

5   consumer-owned electric utilities and investor-owned electric utilities subject to the

6   requirements of chapter 19.405 RCW, the Washington clean energy transformation act, to

7   be eligible for allowance allocation as provided in this section *in order to mitigate the*

8   *cost burden of the program on electricity customers*." RCW 70A.65.120(1) (emphasis

9   added). This express purpose plainly does not discriminate against out-of-state economic

10  interests.

11      **c.     The CCA does not discriminate against out-of-state entities in effect.**

12      The CCA also does not discriminate in effect. Most importantly, Plaintiffs do not

13  articulate how the CCA discriminates in effect against *any* legally cognizable out-of-state

14  economic interest; again, Grays Harbor Energy LLC—the sole owner of the Grays

15  Harbor Energy Center—is an in-state entity that produces and sells its own electricity in

16  Washington. Separately, because electricity generating facilities and electric utilities are

17  not substantially similar entities for Commerce Clause purposes, the CCA's differing

18  treatment of them does not discriminate in effect. For each of these reasons alone, the

19  CCA's allocation of no-cost allowances to electric utilities does not discriminate in

20  effect.

21

22

1    Plaintiffs additionally fail to plausibly allege that PacifiCorp, the owner of an

2    electric utility in Washington that is entitled to no-cost allowances under the CCA, is an

3    in-state entity. Plaintiffs acknowledge that PacifiCorp "is headquartered in Oregon," Dkt.

4    1, ¶ 48 n.8, yet they allege that it is an in-state entity because it "conduct[s] significant

5    commercial and political activities in Washington." *Id.* ¶ 48; *see also* Dkt. 27 at 10–11.

6    According to Plaintiffs, "extensive practical connections" to a State, "not corporate

7    formalities, inform whether an entity is an in-state economic interest." Dkt. 27 at 16

8    (citing *NextEra Energy*, 48 F.4th at 322–24).

9        The Court is not persuaded that, under these circumstances, an entity

10   headquartered out-of-state qualifies as an in-state entity for dormant Commerce Clause

11   purposes simply because it "conducts significant commercial and political activities in

12   Washington."[11] Dkt. 1, ¶ 48. The plaintiffs in *National Pork Producers*, for example,

13   were out-of-state entities because they produced pork outside of California, even though

14   "California imports almost all the pork it consumes." 598 U.S. at 367. In this way, those

15   plaintiffs undoubtedly conducted significant commercial activities in California. The

16

17   _____

18   [11] Ecology asserts that the Eighth Circuit has "reject[ed] the argument that an out-of-state
     company with permanent in-state operations is an in-state interest for Commerce Clause
     purposes." Dkt. 30 at 8 (*citing LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018,
19   1027–29 (8th Cir. 2020), *cert. denied*, __ U.S. __, 141 S. Ct. 1510 (2021)). In the cited case,
     however, the Eighth Circuit declined to address this issue, stating: "[W]e have not squarely
20   addressed the issue of whether an entity that has an in-state presence but is headquartered
     elsewhere is considered an in-state entity for the purpose of dormant Commerce Clause review.
     We need not do so now." *LSP Transmission Holdings*, 954 F.3d at 1029 n.7. Nevertheless, the
21   court noted "that it would be somewhat awkward to label a [state] law as discriminatory despite
     benefitting a company that has an operation in [the State] but is principally located or
22   headquartered elsewhere." *Id.*

1 │ Court also fails to see the relevance in this case of an entity's political activities in

2 │ Washington for determining whether it is an in-state entity.

3 │      Plaintiffs rely on *NextEra Energy*. There, the Fifth Circuit made several statements

4 │ that, when read outside the specific context of that case, may appear to support Plaintiffs'

5 │ proposed standard. For instance, the court stated that, "[f]or the concern about in-state

6 │ interests being able to obtain favorable treatment over out-of-state interests, local

7 │ presence, rather than place of incorporation, should matter." *NextEra Energy*, 48 F.4th at

8 │ 323. The court also questioned: "Which business is more likely to have the clout to enact

9 │ protectionist measures: a Delaware corporation that employs thousands of workers in a

10 │ state, or a company that paid a nominal filing fee to be incorporated in state but has its

11 │ 'principal operations' elsewhere?" *Id.* The court answered: "[W]here a company is

12 │ 'based' is not controlling, and the underlying concern about local clout leading to

13 │ protectionist legislation, a law can discriminate against interstate commerce even though

14 │ most of the" entities that benefit from the law "are incorporated or headquartered"

15 │ elsewhere. *Id.* at 323–24.

16 │      Yet "'[t]he language of an opinion is not always to be parsed as though we were

17 │ dealing with language of a statute.'" *Nat'l Pork Producers*, 598 U.S. at 373 (quoting

18 │ *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). "Instead, . . . opinions dispose of

19 │ discrete cases and controversies and they must be read with a careful eye to context."

20 │ *Nat'l Pork Producers*, 598 U.S. at 373–74.

21 │      *NextEra Energy* in inapposite. It concerned a Texas statute which provided that

22 │ "the ability to build, own, or operate new [transmission] lines 'that directly [connect]

with an existing utility facility . . . may be granted only to the owner of that existing

facility.'" *NextEra Energy*, 48 F.4th at 310 (second and third alterations in original)

(quoting TEX. UTIL. CODE § 37.056(e)). Under that statute, "the only way a company

without a Texas presence can build, operate, or own transmission lines is to buy a utility

that already owns a power facility in the state." *Id.* at 314.

The Fifth Circuit found it irrelevant that "most of the in-state incumbents [the

statute] protects are incorporated [or headquartered] outside Texas." *Id.* at 322. It

explained that "[w]hat matters instead is that the Texas law prevents those without a

presence in the state from ever entering the portions of the interstate transmission market

that cross into Texas." *Id.* at 324. Because "[a] law that 'discriminates among affected

business entities according to the extent of their contacts with the local economy' may

violate the Commerce Clause," *id.* (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27,

42 (1980)), the Fifth Circuit held that the statute discriminated against out-of-state

economic interests. *Id.* at 326.

The CCA does nothing of the sort. Plaintiffs do not claim that the CCA, for

example, limits the ownership of electric utilities or electricity generating facilities to

entities with an existing presence in Washington, or otherwise imposes a burden on

entities without an existing presence in the State. Therefore, Plaintiffs' reliance on

*NextEra Energy* is misplaced.

Aside from failing to plausibly allege that PacifiCorp is an in-state owner of an

electric utility, Plaintiffs also fail to adequately account for two in-state owners of

electricity generating facilities. Specifically, the University of Washington (UW) and

1   Washington State University (WSU) own and operate electricity generating facilities,

2   Dkt. 22-3,[12] that appear to generate more than 25,000 metric tons of carbon dioxide

3   equivalent per year. *See* Dkt. 22-4 at 2 (stating that, in 2021, UW's total emissions

4   amounted to 89,624 metric tons of carbon dioxide equivalent, and WSU's total emissions

5   amounted to 62,454 metric tons of carbon dioxide equivalent). This would make these

6   facilities "covered entities" under the CCA. *See* RCW 70A.65.010(23); WAC 173-446-

7   030; WAC 173-446-060. Because these in-state owners of electricity generating facilities

8   also appear to be subject to the CCA and not entitled to no-cost allowances, Plaintiffs'

9   claim that the CCA discriminates in effect fails.

10      Plaintiffs argue that "the data [Ecology] provides do not identify whether these

11  power plants produced the recorded emissions." Dkt. 27 at 8 n.3. But Ecology

12  convincingly replies that "there is no other conceivable activity under which either UW

13  or WSU would generate large quantities of greenhouse gas emissions of the type covered

14  by the CCA *but for* these facilities." Dkt. 31 at 2; *see Vasquez*, 487 F.3d at 1249 (on a

15  motion to dismiss, plaintiffs are not entitled to unwarranted inferences in their favor). In

16  any event, *Plaintiffs* bear the burden of pleading a plausible claim, *see Iqbal*, 556 U.S. at

17

18      [12] Pursuant to Federal Rule of Evidence 201, Ecology requests the Court to take judicial
notice of six documents filed with various federal and state agencies. Dkt. 22 at 1–3. Plaintiffs do

19  not object to the Court taking judicial notice of five of these documents. Dkt. 28 at 1. However,
they oppose the Court taking judicial notice of one of these documents—an excerpt of a

20  Washington greenhouse gas reporting program publication, Dkt. 22-4— "to the extent that
Defendant claims [the emissions data in this publication] provide a basis for the Court to
conclude these universities' power plants qualify as covered entities under the [CCA]." *Id.* at 1–

21  4. This argument essentially asks the Court to not make an unwarranted inference from the
disputed document. It does not concern whether the Court may take judicial notice of the

22  document itself. Accordingly, the Court takes judicial notice of all six documents.

1   678, and they do not plausibly allege that these in-state electricity generating facilities are

2   not subject to the CCA.

3         Plaintiffs also argue that Ecology "has offered no evidence that these power plants

4   compete against Grays Harbor and the twelve other power plants identified in [the]

5   Complaint." Dkt. 27 at 8 n.3. But again, Plaintiffs bear the burden of pleading a plausible

6   claim. *See Iqbal*, 556 U.S. at 678. Their failure to allege any facts indicating that the

7   Grays Harbor Energy Center does not compete in any way against these facilities is

8   another deficiency in their complaint. Although this particular deficiency might be

9   curable through further amendment, the others are not.

10         In sum, regardless of whether an electric utility is owned by an in-state entity or an

11   out-of-state entity, the CCA treats that utility the same as any other electric utility: it is

12   entitled to no-cost allowances. Similarly, regardless of whether an electricity generating

13   facility is owned by an in-state entity or an out-of-state entity, the CCA treats that facility

14   the same as any other electricity generating facility: it is not entitled to no-cost

15   allowances. Plaintiffs accordingly fail to plausibly allege that the CCA's allocation of no-

16   cost allowances to electric utilities, but not to electricity generating facilities,

17   discriminates against out-of-state economic interests.

18         For these reasons, even if Plaintiffs had standing to advance their dormant

19   Commerce Clause claims, these claims would fail on the merits. Because these claims

20   could not be cured through further amendment, they would be dismissed with prejudice.

21   *See Cook, Perkiss & Liehe*, 911 F.2d at 247.

22

1   **E.     Plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment also fails.**

2

3          Plaintiffs allege that the CCA's allocation of no-cost allowances to electric

4   utilities, but not to electricity generating facilities like the Grays Harbor Energy Center,

5   violates the Equal Protection Clause of the Fourteenth Amendment by "treat[ing]

6   independent power plant owners differently from other similarly situated plant owners,

7   namely local utilities," in a manner that "is not rationally related to any legitimate

8   governmental purpose." Dkt. 1, ¶ 187.

9          Ecology asserts that this "claim fails for the simple reason that there is no

10  discrimination to begin with." Dkt. 21 at 21. It also contends that, "even if Plaintiffs were

11  similarly situated and differently treated, Plaintiffs still cannot meet their burden to

12  negate the Legislature's policy determination." *Id.*

13         Plaintiffs respond that, "[a]s power-plant owners," they are "materially the same"

14  as the utilities that benefit under the CCA—each "own and operate power plants that

15  generate indistinguishable electricity in more-or-less the same manner." Dkt. 27 at 27.

16  Plaintiffs also argue that the CCA's allocation of no-cost allowances to electric utilities

17  does not bear a rational relation to a legitimate end because it actually "increas[es] both

18  greenhouse-gas emissions and electricity costs." *Id.* at 28.

19         Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall

20  . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.

21  CONST. amend. XIV, § 1. In essence, the clause "mandates that similarly situated persons

22  be treated alike." *Nw. Grocery Ass'n v. City of Seattle*, 526 F. Supp. 3d 884, 893 (W.D.

Wash. 2021) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "[I]f a law neither burdens

a fundamental right nor targets a suspect class, [courts] will uphold the legislative

classification so long as it bears a rational relation to some legitimate end." *Romer v.*

*Evans*, 517 U.S. 620, 631 (1996). A law reviewed under the rational basis standard bears

"a strong presumption of validity" and the attacking party has "the burden 'to negative

every conceivable basis which might support it.'" *F.C.C. v. Beach Commc'ns*, 508 U.S.

307, 314–15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356,

364 (1973)). Furthermore, a "[l]egislative choice is not subject to courtroom fact-finding

and may be based on rational speculation unsupported by evidence or empirical data."

*Beach Commc'ns*, 508 U.S. at 113.

   As an initial matter, the Court concludes that Invenergy lacks constitutional

standing to advance this claim for the same reason that it lacks standing to advance a

claim under the dormant Commerce Clause: it does not own the Grays Harbor Energy

Center and, therefore, does not allege an injury in fact. Because this standing deficiency

cannot be cured through further amendment, Invenergy's claim under the Fourteenth

Amendment's Equal Protection Clause is **DISMISSED with prejudice**. *See Schmier*,

279 F.3d at 824 (9th Cir. 2002); *Fieldturf, Inc.*, 357 F.3d at 1269.

   Next, Grays Harbor Energy LLC fails to allege a plausible claim under the Equal

Protection Clause. Because electric utilities and electricity generating facilities are not

similarly situated, the CCA's allocation of no-cost allowances to electric utilities does not

discriminate in violation of the Equal Protection Clause. For this reason alone, Grays

Harbor Energy LLC fails to state a plausible claim.

1    Grays Harbor Energy LLC also fails to plausibly allege that the challenged statute

2   does not bear a rational relation to some legitimate end. Again, the purpose of the CCA's

3   allocation of no-cost allowances to electric utilities is "to mitigate the cost burden of the

4   [cap and invest] program on electricity customers." RCW 70A.65.120(1). There can be

5   no debate that this is a legitimate end. *See Tracy*, 519 U.S. at 306. There is also no doubt

6   that the allocation of no-cost allowances to electric utilities—which sell electricity

7   directly to the public—bears a rational relation to this end. Plaintiffs' complaints that the

8   CCA does not achieve this goal effectively and in reality are immaterial. *See Beach*

9   *Commc'ns*, 508 U.S. at 113.

10    Accordingly, Grays Harbor Energy LLC fails to allege a plausible claim under the

11   Fourteenth Amendment's Equal Protection Clause. Because this claim cannot possibly be

12   cured by the allegation of other facts, this claim is **DISMISSED with prejudice**. *See*

13   *Cook, Perkiss & Liehe*, 911 F.2d at 247.

14                                  **III.  ORDER**

15    Therefore, it is hereby **ORDERED** that Ecology's motion for a judgment on the

16   pleadings, Dkt. 21, is **GRANTED.** All of Plaintiffs' claims are **DISMISSED with**

17   **prejudice** and **without leave to amend**.

18    The Clerk shall enter a **JUDGMENT** and close the case.

19    Dated this 3rd day of November, 2023.

20

21    _____

22    BENJAMIN H. SETTLE
     United States District Judge